# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF GEORGIA

# SAVANNAH DIVISION

| | | |
|---|---|---|
| JENNIFER ZOTTOLA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. CV411-154 |
| | ) | |
| ANESTHESIA CONSULTANTS OF | ) | |
| SAVANNAH, P.C., | ) | |
| | ) | |
| Defendants. | ) | |

## **O R D E R**

Plaintiff in this employment discrimination suit has filed a motion to compel discovery from defendant. Specifically, plaintiff asks the Court to order defendant to supplement its responses to certain written discovery requests (Interrogatory No. 12 and Requests to Produce Nos. 7 & 11) and to produce a corporate employee (Dianne Thistlethwaite) for redeposition as a witness who can speak for the defendant corporation. (Docs. 21-1 & 26.)

Plaintiff worked as an office manager for a group of physicians doing business as a Georgia professional corporation. Plaintiff alleges that she was subjected to discrimination and ultimately terminated because of her multiple pregnancies. (Doc. 1.) Defendant has denied any

discrimination and claims that it terminated plaintiff because she made false statements on a performance evaluation (doc. 8), an explanation that plaintiff alleges to be a mere pretext for discrimination. (Doc. 21-1 at 3.) Plaintiff's theory of the case is heavily dependent upon the timing and sequence of events in July and August 2009, just prior to her August 7, 2009 termination. (*Id.* at 10-11.)

The motion and response present a vigorous debate about the adequacy of defendant's responses to written discovery and its failure to update those responses following certain disclosures made by its corporate representative, Dr. Robert Jarman, during his Fed. R. Civ. P. 30(b)(6) deposition. Much of the controversy surrounds plaintiff's Interrogatory No. 12, which reads as follows:

> State the name, present address and telephone number of each and every person who contributed to the decision to terminate Plaintiff from employment with the Defendant, specifying the particular role and the particular authority of each such person, specifying who made the recommendation, who was contacted regarding the termination, and who prepared documentation related to the termination.

(Doc. 21-1 at 4.) Defendant answered the interrogatory thusly:

> Dianne Thistlethwaite, Practice Administrator, whose contact information has been provided throughout these responses to Plaintiff's Interrogatories, made the decision. She reported her decision to Dr. Robert Jarman, who was, at the time, the Vice-

President of the group.  Dr. Jarman's contact information is provided in Defendant's response to Interrogatory (13).

(Doc. 24 at 5.)

Some 2 months after receiving the interrogatory answer (in December 2011), and after taking Mrs. Thistlethwaite's deposition, plaintiff commenced her initial Rule 30(b)(6) examination of Dr. Jarman. (Doc. 24, ex. D.)  During that deposition  Dr. Jarman revealed that both he and Mrs. Thistlethwaite consulted with defendant's corporate counsel on several occasions to determine whether defendant was "on solid ground" to fire a pregnant employee.[1]  (*Id.* at 34.)  After receiving counsel's advice Dr. Jarman and Mrs. Thistlethwaite felt comfortable in terminating plaintiff's employment.  (*Id.* at 42, 46.)  It is uncontested that plaintiff did not know about defendant's consultation with corporate counsel prior to the February 23, 2012 deposition of Dr. Jarman.

Plaintiff asserts in her motion that "*[u]nquestionably, defendant's corporate counsel made a contribution to the decision to terminate*" her employment.  (Doc. 21-1 at 5 (emphasis in original).)  Plaintiff contends

---

[1] When pressed as to why he was concerned about plaintiff's pregnancy, Dr. Jarman explained that "if you terminate somebody who's pregnant, then they can claim that they've been terminated because they're pregnant, whether that be true or not." (Doc. 24, ex. D at 34.)  Dr. Jarman stated that he and Mrs. Thistlethwaite sought legal advice "[b]ecause Jennifer was pregnant and her performance and her behavior required her termination." (*Id.* at 37.)

that defendant must supplement its response to Interrogatory No. 12 to reflect "the name, present address, and telephone number of corporate counsel who contributed to the decision" (*id*. at 9), "including the dates of consultation with corporate counsel." (*Id*. at 10.) Defendant responds that Dr. Jarman and Mrs. Thistlethwaite "were the only individuals who contributed to the decision to terminate Plaintiff," and points out that "nothing in the record . . . suggests that [its] counsel actually contributed to the decision to terminate Plaintiff." (Doc. 24 at 5.) Defendant further notes that plaintiff's written discovery never specifically asked whether it had "consulted" with its corporate counsel.[2]

---

[2] Interrogatory No. 12 did ask defendant to state "who was contacted regarding the termination" (doc. 21-1 at 4), and plaintiff suggests that defendant violated its discovery obligations by failing to identify "its corporate counsel as having been contacted." (Doc. 26 at 2-3.) Plaintiff contends that "[t]he clarity of [her] discovery requests in seeking . . . information [about any *contacts* with corporate counsel] cannot reasonably be questioned." (*Id*. at 2.) *Au contraire*. Interrogatory No. 12 is framed as a single sentence consisting of an independent clause -- which asks defendant to identify each person "who contributed" to the decision to terminate -- followed by a series of subordinate clauses seeking certain specific information about . . . whom? One way to read the interrogatory is this: that the subordinate clauses seek specific information only about the cohort of individuals referenced in the preceding independent clause as contributors to the termination decision, "specifying" their "role" and "authority," which of them made "the recommendation," and which of them "was contacted" or "prepared documentation" regarding the termination. That is the construction defendant places upon the interrogatory. But another way to read the one-sentence interrogatory involves a more gymnastic approach to its structure -- i.e., that it first asks for certain particulars about just those individuals "who contributed" to the termination ("specifying [their] particular role . . . and . . . authority") and then, presto chango, switches its meaning in the remainder of the sentence to capture the broader category of those who made recommendations, were "contacted," or "prepared

4

The record does offer support for plaintiff's contention that defendant's corporate counsel, Lee Summerford, contributed to the decision to terminate her employment. During his deposition, Dr. Jarman testified not only that Mr. Summerford was consulted about the termination issue but also that his advice was taken into account by the decisionmakers (described as Jarman and Thistlethwaite) before they made their decision. For instance, he testified that Mr. Summerford "was consulted on the phone about the issues of termination and gave us his counsel" (doc. 24, ex. D. at 124), and that it was after receiving counsel's advice that defendant proceeded to fire plaintiff. (*Id*. at 42; *see also id*. at 46.) Dr. Jarman further testified that Mr. Summerford's legal advice was "[c]onveyed in some way" to defendant's board of directors. (*Id*. at 126.) Dr. Jarman, however, did not agree that Mr. Summerford's

documentation" *whether or not* they "contributed" to the termination decision. In other words, the interrogatory defines a set, and then a subset, and then a broader set than the first set. Plaintiff favors this interpretation. The discovery request would have been improved and clarified had plaintiff made it crystal clear that she was seeking the universe of people who were contacted, regardless of their ultimate contribution, if any, to the final decision. But the Court need not decide which construction of the interrogatory is the most reasonable, or whether either construction is reasonable at all, for this reason: plaintiff's demand that defendant supplement its interrogatory answer to identify corporate counsel as one who was "contacted" about the termination is pointless, for that fact came to light during other discovery. Indeed, plaintiff has known about this contact since Feb. 13, 2012, the date of Dr. Jarman's first deposition. The federal rules do not require a party to supplement a discovery request with information that has already come to light "during the discovery process." Fed. R. Civ. P. 26(e).

"counsel and wisdom . . . inform[ed] the Board discussion." (*Id.* at 126 (quotation taken from a question asked by plaintiff's counsel).)

A common dictionary definition of the intransitive verb "contribute" is "to be an important factor in; help to cause." Random House Dictionary of the English Language 442 (2d ed. unabridged 1987). In some places Dr. Jarman's testimony suggests that Mr. Summerford played just such a role, for he implies not only that counsel's advice was sought but that it was taken into account by the decisionmakers. Defendant continues to insist, however, that Mr. Summerford did not contribute to the termination and that the decision to terminate was made exclusively by Dr. Jarman and Mrs. Thistlethwaite. Dr. Jarman's deposition does not entirely rule out this possibility, for we do not know what substantive advice Mr. Summerford gave defendant. If, for example, he advised strongly *against* termination and defendant proceeded to fire plaintiff in contravention of that advice, it would not be accurate to say that he was "an important factor in" or "help[ed] to cause" the termination.[3] *Id.*

---

[3] There are other possibilities as well. Suppose an attorney consulted about a termination decision gives uncertain or ambivalent advice, or points out that the legal authorities are split on the issue. Can the attorney's advice be said to have played an important role in the decision made by the client under such

Plaintiff states in her motion that she is seeking "non-privileged information responsive to Interogatory No. 12" (doc. 21-1 at 9), and disavows any intent to discover "the substantive advice provided by corporate counsel to Defendant" regarding this matter. (*Id*. at 10.) But revealing whether Mr. Summerford contributed to the decision to terminate effectively discloses the substance of that advice, for it signals that corporate counsel must have advised defendant that the termination was legally appropriate (and that he became a contributor to the termination decision when defendant followed that advice). So, asking whether corporate counsel contributed to the decision probes into the substance of the advice, at least to some extent. Further, forcing defendant to identify Mr. Summerford as a contributor (if indeed he was) avails plaintiff nothing. Plaintiff concedes that any information furnished by counsel is likely privileged and therefore not admissible in these proceedings. And even if it were not privileged, how would plaintiff benefit by revealing to the factfinder that defendant sought and received legal advice that its decision to terminate her employment was permissible under the law? So this appears to be much ado about

circumstances? Reasonable people might disagree on this question.

nothing.[4]

What is important to plaintiff, and what she continually references in her motion to compel, are the *dates* of defendant's consultation with corporate counsel regarding the proposed termination. Defendant claims that this decision rested on its discovery that plaintiff had provided false information on a written performance evaluation done in late July or early August 2009. Plaintiff insists that the reason proffered is mere pretext, for she claims to have evidence that the decision to terminate was made *before* the performance evaluation and subsequent audit of her work. (For instance, she asserts that defendant posted the availability of her job on July 13, 2009, weeks prior to the discovery of the alleged falsehood that defendant offers as the reason for her termination. (Doc. 21-1 at 3, 10.).) The timing of defendant's consultation with corporate counsel thus assumes great importance in this litigation, for if any such conversations "occurred *before* the audit, Defendant's alleged legitimate non-discriminatory reason for terminating [plaintiff] is substantially undermined . . . ." (*Id*. at 10-11.)

---

[4] Nevertheless, since defendant has not asserted that disclosing the mere fact of any contribution invades the attorney-client privilege, it is directed to reconsider its interrogatory answer to make certain that its interpretation of the phrase "contributed to" is consistent with the definition set forth above. If not, defendant shall amend its answer accordingly.

Plaintiff is fairly entitled to discovery on this point.[5] While plaintiff's written discovery did not apprise defendant that she was seeking the dates of all consultations with corporate counsel, the amended Rule 30(b)(6) deposition notice certainly made that point clear. That notice -- given after Dr. Jarman first revealed that such consultations had occurred -- required defendant to designate someone "who can testify on its behalf with respect to the . . . *[d]ates of all consults* of ACS representatives with attorney Lee Summerford regarding ACS' concern about terminating Jennifer Zottola while she

---

[5] But her assertion that "the dates of the meetings between employees of defendant and corporate counsel . . . comes within the terms of the interrogatory" is simply wrong. (Doc. 21-1 at 5.) Nowhere in Interrogatory No. 12 does plaintiff ask for dates of any kind. Similar problems arise with respect to plaintiff's requests to produce. Request No. 7 asked for documents which "relate to any *investigation* conducted . . . by . . . Defendant regarding Plaintiff or Diane Thistlethwaite." (*Id.* at 6 (emphasis added).) Request No. 11 seeks "all correspondence, memoranda, or other writings between or among Defendants' [sic] agents, and/or other employees . . . relating to Plaintiff's allegations of discrimination." (*Id.* at 6-7.) Plaintiff asserts that these requests clearly encompass billing records or other documents reflecting defendant's consultation with its corporate counsel. But this is not the case. Consulting with counsel about a legal matter does not constitute an "investigation" within the ordinary meaning of that word, and there is no evidence suggesting that corporate counsel conducted his own investigation here. While Request No. 11 asked for correspondence between defendant's "agents or employees" regarding plaintiff's allegations of discrimination, it would not likely have occurred to defendant that plaintiff was seeking correspondence with an attorney that it had consulted about the termination, for such documents lie at the heart of the attorney-client privilege, litigants know this, and few attorneys ever bother to seek such information. (And if plaintiff really intended its request to encompass such correspondence and memoranda, then the request would apply equally to correspondence between defendant and its present trial counsel, for almost certainly they have communicated in writing about matters "relating to Plaintiff's allegations of discrimination." Plaintiff has never taken this position, and for good reason.)

was pregnant in 2009." (Doc. 26-1 at 7 (emphasis added).) But when Dr. Jarman was asked to furnish the consultation dates specified in the deposition notice, he was unable to do so. (Doc. 26, ex. D at 127, 136, 137-38.) Instead Dr. Jarman deferred to Mrs. Thistlethwaite, who he surmised "can be much more specific than I can on this issue." (*Id.* at 127.) After noting Dr. Jarman's unpreparedness to testify as to a matter specified in the Rule 30(b)(6) deposition notice (*id.* at 136), plaintiff's counsel announced that he would suspend the deposition. (*Id.* at 139.) Plaintiff now seeks permission to reconvene the Rule 30 (b)(6) deposition of defendant so that she can further explore this issue with a corporate representative who *is* prepared to be examined on this point.[6] (Doc. 26 at 9-10.)

---

[6] Defendant points out that Dr. Jarman carefully prepared for his deposition as corporate representative, spending some 10 hours or more viewing all available documentation and speaking at length with his practice manager Mrs. Thistlethwaite. (Doc. 24 at 9.) Defendant represents that Dr. Jarman "provided Plaintiff with all information in [its] possession regarding . . . the topics contained in Plaintiff's Fed. R. Civ. P. 30(b)(6) Notices . . . ." (*Id.* at 8, 9.) But that is not the position Dr. Jarman took during his deposition, for when he acknowledged that he could not provide plaintiff "with a precise time or date" as to consultations with corporate counsel, he expressed his belief that Mrs. Thistlethwaite likely could offer additional information on the issue. (*Id.*, ex. D at 127.) At no point did Dr. Jarman suggest that he had discussed this particular question with Mrs. Thistlethwaite in preparation for his deposition. So, at the time of his deposition, Dr. Jarman did not believe he was providing plaintiff "with all information in [defendant's] possession" regarding the consultation dates. Indeed, in addition to Mrs. Thistlethwaite's superior knowledge, Dr. Jarman assumed that documents in possession of corporate counsel would reflect more precisely the dates of such consultation. (*Id.* at 136-37.)

Defendant argues that plaintiff's request for a further corporate deposition is unnecessary because it is unaware of any person or document "that can pinpoint the date of Mrs. Thistlethwaite's conversations with corporate counsel." (Doc. 24 at 10.) In support of this assertion defendant refers to affidavits (secured after plaintiff filed her motion to compel) from Dr. Jarman, Mrs. Thistlethwaite, and corporate counsel Lee Summerford. (*Id.*, exs. A, B, C.) Plaintiff objects to the use of such affidavits as a substitute for deposition testimony or more focused responses to her written discovery requests. (Doc. 26 at 4-6.) She specifically asks that defendant "offer Mrs. Thistlethwaite for the corporate Rule 30(b)(6) deposition." (*Id.* at 6.)

After a thorough review of the record and consideration of the parties' arguments, the Court is satisfied that plaintiff is entitled to a further deposition of the defendant. As a general matter, affidavits cannot be used as a means of curtailing a party's right to depose a person who may have knowledge of facts at issue in civil litigation.[7] Here,

---

[7] Affidavits are often used in litigation, of course, and they are acceptable in many contexts. But while an affidavit constitutes a sworn statement (and is thus subject to the normal penalties for intentional misstatements), the affiant is not available for clarification of his statements or subject to the rigors of cross examination, "'the greatest legal engine ever invented for the discovery of truth.'" *Perry v. Leeke*, 488 U.S. 272, 283 (1989) (quoting 5 J. Wigmore, Evidence § 1367, p. 32 (J. Chadbourn rev. 1974)).

plaintiff asserts that defendant's proffered reason for her termination --
allegedly lying on a performance evaluation -- is mere pretext for
discrimination and believes the evidence will show that defendant had
commenced the termination process *before* it conducted its review of that
evaluation. The timing of defendant's consultation with its corporate
counsel is a potentially important consideration, for if that consultation
occurred prior to defendant's discovery (or reliance upon) the alleged lie,
then plaintiff's pretext argument is bolstered.

True, further discovery along these lines would be both pointless
and wasteful if, in fact, there is no additional information to be disclosed.
But as plaintiff observes, the affidavits tendered by defendant do not
conclusively allege, much less establish, that further discovery will yield
no useful information. For example, Mrs. Thistlethwaite represents in
her affidavit that she contacted defendant's corporate counsel
"[s]ometime in late July of 2009" but cannot "recall the *exact date*."
(Doc. 21-1 at ¶¶ 6-7 (emphasis added)). But an inability to recall the
exact date does not exclude the possibility that she can be more precise
about what she means by "late July" or that she has some knowledge as
to whether her conversation with counsel occurred before or after the

performance review audit. Similarly, the affidavit from Lee Summerford represents that his firm's records do not reflect any "time entries for legal services in 2009 relating to Jennifer Zottola" or "relating to consultation regarding administrative staff personnel issues" pertinent to the Zottola case. (Doc. 24-3 at ¶¶ 6-7.) He further states that his firm did not "generate any bills . . . that referred to Jennifer Zottola." (*Id.* at ¶ 8.) But as plaintiff points out, this affidavit leaves open the possibility that there are time entries *using other descriptors* that bear on the date issue, or that other documentation (or memory) exists regarding the timing of the discussions between Mrs. Thistlethwaite and Mr. Summerford.[8] Plaintiff finds it difficult to believe that neither defendant nor its corporate counsel has any documentation whatsoever reflecting the timing of the consultation discussions. The fact that plaintiff is a doubting Thomas, of course, does not establish that such documentation actually exists. The point is, given the potential importance of the matter, plaintiff should be given a limited opportunity to flesh out this issue during further discovery.

Defendant, therefore, is required to select a corporate

---

[8] The Court does not mean to imply that Mr. Summerford is being evasive or misleading in his affidavit, only that further discovery may nail down those loose ends with greater certainty.

representative who can offer further testimony regarding the timing of its consultations with corporate counsel about terminating plaintiff's employment. Prior to any such deposition defendant shall again confer with Lee Summerford and impress upon him the need to conduct a searching inquiry of his files and records to ensure that he has not overlooked some memorandum or other notation that might shed even the palest light on this question. If no such records are found to exist, then Mr. Summerford should be asked to furnish a further affidavit affirmatively stating that, after additional review, he has located no billing records, memos, notes to file, phone logs, e-mails, letters, or other materials of any kind that reflect the dates of his consultations with any of defendant's officers, directors, employees, or other representatives about the decision to terminate plaintiff's employment in 2009. Defendant's corporate representative shall be prepared to testify that he or she has spoken personally with both Mr. Summerford and Mrs. Thistlethwaite[9] about this matter and has gathered together all

---

[9] Defendant is free to choose Mrs. Thistlethwaite as its corporate representative if it wishes. But given all that occurred during her prior deposition (more about that momentarily) the Court will not mandate that it do so. All information within her knowledge regarding this matter, however, shall be plumbed and brought to light by the defendant.

"information known or reasonably available to" the corporation regarding the timing of these consultations. Fed. R. Civ. P. 30(b)(6).

The behavior of plaintiff's counsel in this case, as reflected in the deposition transcripts the Court has reviewed, calls for certain restrictions and conditions on the taking of any further deposition of the defendant. Mr. Jack Rosenberg, plaintiff's chief counsel, is clearly a capable and skillful attorney. But at certain times during these depositions he has stepped outside the bounds of propriety and proper conduct expected of counsel who practice before this Court.

Mr. Rosenberg deposed Mrs. Thistlethwaite on January 13, 2012. Early in the deposition, perhaps in an attempt at humor, Mr. Rosenberg invited the witness to call him a "jerk" if she liked.[10] (Doc. 24, ex. E at 10.) On occasion during the deposition he certainly earned that appellation. Mr. Rosenberg questioned Mrs. Thistlethwaite at length

---

[10] The deposition transcript reads:

> Mr. Rosenberg: Ms. Thistlethwaite, may I call you Dianne if you want to call me Jack.
> A. Yes.
> Q. Or jerk or whatever you'd like.

(Doc. 24, ex. E at 10.) This Court's local rules provide that an attorney "shall not exhibit familiarity with witnesses, jurors, or opposing counsel. The use of first names is to be avoided." LR 83.14. Defense counsel did not object to the familiar use of the witness's first name in this instance. Mr. Rosenberg shall not resort to this practice during any future depositions in this Court.

about highly personal and sensitive matters that have no bearing on the subject matter of this litigation, much less the specifics of any claim or defense asserted by the parties. Some examples from the deposition transcript:

> P. 25    "Tell me about your first relationship with a gentleman. When did you first start dating? . . . How many boyfriends before [your marriage] approximately?"[11]

> P. 26    "How did you meet [your husband]? . . . How long did you date?"

> P. 39    "Tell me about [your] divorce . . . . Did you have any indication that [your husband] was running around on you? . . . Did he lose interest [in you]?"

> P. 47    "Now, when did you marry your present husband? . . . and how did you all meet? . . . Did you begin dating him while he was still married to his wife?"

Defense counsel ultimately threatened to suspend the deposition because of this "irrelevant . . . harassing and intimidating" line of questioning. (*Id.* at 42.) Mr. Rosenberg announced that he would "not have any restrictions," opining that the "Federal Rules are very clear . . . [t]hat the only thing that's off limits is anything that's intended to harass, and I forgot the other one . . . ." (*Id.* at 42.) Later in the deposition defense

---

[11] At this point defense counsel objected to the relevance of the questions and asked to go off the record momentarily, prompting this response from Mr. Rosenberg: "No. We're not going off the record. These are straightforward questions. There's nothing wrong with them." (Doc. 24, ex. E at 25-26.)

counsel objected on 5 occasions to Mr. Rosenberg "yelling" at her client or "leaning across the table in a hostile manner." (*Id.* at 190; 191 ("Jack, it's not necessary to yell at my client."); 192 ("Stop yelling at my client."); 203 ("You continue to be yelling at my client. It's unacceptable."); 223 ("You can stop yelling at my client, please.").) Not once did Mr. Rosenberg dispute this characterization of his conduct. Nor has he done so in any subsequent filing with the Court.

An even more blatant and disturbing form of misconduct occurred during a deposition conducted by Mr. Rosenberg on February 23, 2012. (Doc. 24, ex. F (Shappee Depo.).) Midway through that deposition Mr. Rosenberg and defense counsel engaged in a heated exchange about the tone of his examination (with defense counsel indicating that she was "tired of you badgering my witness"), which culminated in defense counsel threatening "to call the Judge." (*Id.* at 57, 58.) The following exchange occurred:

MS. BOWEN: I'm happy to call the Judge.

MR. ROSENBERG: Do it. Do it. Do it.

MS. BOWEN: Let's identify --

MR. ROSENBERG: Do it. Don't bluff.

MS. BOWEN: *I object to you throwing your phone at me, Jack.*

(*Id.* at 58 (emphasis added).) Mr. Rosenberg did not contest this description of his conduct. Defendant has since furnished an affidavit from the court reporter who recorded the deposition. (Doc. 24, ex. G.) Therein the court reporter avers that she "witnessed attorney Jack Rosenberg toss his mobile telephone across the table at attorney Maury Bowen . . . [causing] the mobile telephone [to] land noisily on the table directly in front of Ms. Bowen." (*Id.* ¶¶ 6-7.) Mr. Rosenberg did not advert to this matter in his reply brief. (Doc. 26.)

Yelling at deposition witnesses, harassing and embarrassing them with questions about highly sensitive matters irrelevant to the litigation, and rudely tossing a phone at opposing counsel in anger are all offensive behaviors that fall well outside the bounds of professional conduct. Such incivilities not only constitute conduct unbecoming a member of the bar but violate specific rules that govern the practice of law before this Court. The local rules specifically state that "[w]itnesses shall not be shouted at . . . or otherwise abused." LR 83.15. The bar rules prohibit "conduct intended to disrupt a tribunal," Ga. Rule of Prof'l Conduct 3.5 (c); ABA Model Rule of Prof'l Conduct 3.5 (d) (with a comment defining

"tribunal" as including a deposition), and yelling at a witness or throwing a cell phone at opposing counsel certainly qualifies as disruptive behavior. The federal discovery rules allow for sanctions against an attorney "who impedes, delays, or frustrates the fair examination of the deponent," Rule 30(d)(2), and a fair examination is frustrated by posing questions intended to embarrass and annoy the witness. And even without the rules, and entirely apart from them, a district court is invested with "the inherent power to control the proceedings before it," *Malautea v. Suzuki Motor Co.*, 987 F.2d 1536, 1545 (11th Cir. 1993), and to impose sanctions[12] (without ever instituting contempt proceedings) on lawyers who behave inappropriately. Indeed, district courts should use their

> authority to maintain standards of civility and professionalism. It is precisely when animosity runs high that playing by the rules is vital. Rules of legal procedure are designed to defuse, or at least channel into set forms, the heated feelings that accompany much litigation. Because depositions take place in law offices rather than courtrooms, adherence to professional standards is vital, for the judge has no direct means of control.

---

[12] Here, defendant has not asked the Court to impose sanctions on Mr. Rosenberg. Such a request, of course, is not a prerequisite to the imposition of sanctions, for a court has the right to take notice of and sanction any misbehavior on the part of attorneys who practice before it. But given other measures the Court is taking in this case, neither formal disciplinary proceedings nor inherent-power sanctions will be instituted at this point. The Court, however, reserves the right to revisit this issue if Mr. Rosenberg persists in the unprofessional conduct displayed earlier in this case.

*Redwood v. Dobson*, 476 F.3d 462, 469-70 (7th Cir. 2007) (Easterbrook, J.). Further, the Court's inherent power to control and discipline attorneys for lack of decorum or other misconduct is not displaced by the sanctioning mechanisms established by federal statute or rule. *Chambers v. Nasco, Inc.*, 501 U.S. 32, 46-51 (1991); *F.J. Hanshaw Enterprises, Inc. v. Emerald River Develop., Inc.*, 244 F.3d 1128, 1136-37 (9th Cir. 2001). So, the Court has a lot of arrows in its quiver. And the bow is strung.

The Court hereby imposes the following conditions and restrictions on any further deposition of defendant's corporate representative by plaintiff:[13]

1. The deposition must be videotaped at plaintiff's expense and at least two cameras must be employed, one focused on the witness and another on plaintiff's counsel.

2. The deposition shall be limited to questions related to the dates (or approximate dates) of any consultations between defendant's representatives and its corporate counsel regarding the termination of plaintiff's employment.

---

[13] Plaintiff is not *required* to take a further deposition and, depending on developments, may determine that such a deposition is unnecessary.

3. The deposition shall last no more than one hour.

4. The attorney questioning the deponent shall at all times be respectful, courteous, and civil.

The Court has imposed these conditions without awaiting a Motion for Protective Order from defendant. If defendant believes that additional protections are needed, it may file such a motion within 10 days.

Plaintiff's motion to compel is **GRANTED IN PART**. Discovery is extended for an additional 30 days from this date.

**SO ORDERED** this 7th day of June, 2012.

_____
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA